116 N.J. Super. 260 (1971)
282 A.2d 48
ANNE BOWMAN, ET AL., NEW JERSEY STATE NURSES ASSOCIATION AND JERSEY NURSES' ECONOMIC SECURITY ORGANIZATION, PLAINTIFFS,
v.
HACKENSACK HOSPITAL ASSOCIATION, A NONPROFIT CORPORATION OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided September 17, 1971.
*264 Messrs. Lum, Biunno and Tompkins, attorneys for plaintiffs (Mr. Ronald H. DeMaria appearing).
Messrs. Winne and Banta, attorneys for defendant (Mr. Joseph A. Rizzi appearing).
*265 LORA, J.S.C.
This is an action to compel defendant Hackensack Hospital Association to recognize New Jersey State Nurses' Association (NJSNA) or, in the alternative, Jersey Nurses' Economic Security Organization (JNESO) as collective bargaining representative for the nursing faculty of the School of Nursing of defendant hospital and to order defendant to bargain collectively with NJSNA or JNESO on behalf of the individual plaintiffs; or, to compel a representation election among the nursing faculty of the School of Nursing of defendant hospital to establish the authorized bargaining representative of the individual plaintiffs.
Plaintiffs contend a majority of the nurses employed as faculty in the School of Nursing of the said hospital has expressed a choice of having NJSNA or JNESO represent them for purposes of collective bargaining; that said faculty nurses constitute an appropriate unit for purposes of collective bargaining; that NJSNA and JNESO are organizations entitled to recognition and to the rights and privileges of Art. I, par. 19 of the New Jersey Constitution (1947), but the hospital has refused to recognize either of said organizations as the collective bargaining representative of these employees, and that this court should order defendant to bargain with NJSNA or its component JNESO, or, in any event, to order an election.
Additionally, plaintiffs state that certain bargaining activities that took place in 1968 between defendant and NJSNA and resulted in individual employment contracts with the members of the nursing faculty, constitute "Established practice, prior agreement or special circumstances" which estop defendant from utilizing the defenses it has raised. Board of Education, West Orange v. Wilton, 57 N.J. 404 (1971); N.J.S.A. 34:13A-5.3. However, after consideration of all the testimony adduced at the trial and the circumstances surrounding said negotiations, the court is led to conclude that the proofs fall short of establishing such *266 history and type bargaining contemplated by our Supreme Court in Wilton.
It is defendant's contention that neither NJSNA nor JNESO is an organization entitled to recognition or to the rights and privileges of Art. I, par. 19 of the New Jersey State Constitution since NJSNA consists of supervisory and nonsupervisory personnel and is dominated and controlled by nurses in supervisory positions in their respective employments, and JNESO was created as a component organization merely to avoid the defense that NJSNA is not a proper bargaining representative  that JNESO is completely dependent upon NJSNA, having been created merely by an amendment to the by-laws of its parent organization NJSNA.
Defendant further contends that even if NJSNA or JNESO are organizations entitled to recognition or to the rights and privileges of Art. I, par. 19 of the State Constitution, defendant is still under no obligation to bargain collectively with either of them since the proposed bargaining unit itself (the nursing faculty) consists of supervisory and nonsupervisory personnel and is thus inappropriate for collective bargaining purposes and, additionally, that only a broader bargaining unit, that is, one consisting of all professional service nonsupervisory personnel, or at least one composed of all nonsupervisory registered nurses (faculty and nonfaculty) is appropriate on the basis of the existing mutuality of interests, wages, hours and working conditions.
It is clear that employees of a nonprofit hospital have the constitutional right to organize and bargain collectively for representatives of their own choosing. N.J. Const. (1947), Art. I, par. 19; Johnson v. Christ Hospital, 84 N.J. Super. 541 (Ch. Div. 1964), aff'd 45 N.J. 108, 110 (1965), Independent Dairy Workers, etc. v. Milk Drivers, etc., Local No. 680, 23 N.J. 85 (1956).
The primary purposes of NJSNA are (1) to help nurses maintain high nursing standards, (2) to insure the passage of "good health and welfare laws" and (3) to promote the *267 economic and general welfare of nurses. The Economic Security Program of NJSNA has been in existence for more than ten years. A registered nurse may also become a member of JNESO if she is a member of NJSNA and is not a "supervisor," that is, has no power to hire, fire, discipline, or effectively recommend the same. Johnson, supra, at 84 N.J. Super. 568; N.J.S.A. 34:13A-5.3.
JNESO was formed as of January 1, 1970, is a component part of NJSNA and is "an organizational unit within the State association," its primary purpose being to assist its members in improving their economic and general welfare. Its by-laws provide that the Jersey Nurses' Economic Security Organization" may consist of all members of the New Jersey State Nurses' Association, except nurses deemed to hold administrative positions."
Parenthetically, the court notes that despite the fact that public employment is not involved, the criteria which should be followed in determining whether a person is a supervisor are those set forth in chapter 303 of the Laws of 1968 rather than the more detailed criteria found in the definition of "supervisor" contained in 29 U.S.C.A. § 152(11).
In addition to its collective bargaining activity, NJSNA functions primarily as a professional association. JNESO's primary function is collective bargaining, although it, too, is a professional association and, on occasion, involves itself in matters of professional practice. The NJSNA board of directors has been, throughout the years, comprised predominantly of nurses who in their respective employments are supervisory personnel, not only as that term has been defined in 29 U.S.C.A. § 152(11) but also as defined by N.J.S.A. 34:13A-5.3. While nonsupervisory or nonadministrative registered nurses, that is, staff nurses who do not have the power to hire, fire, discipline, or effectively recommend the same, are occasionally nominated to become officers and members of the board of directors of NJSNA, there has never been any such staff nurse on the board of NJSNA. *268 The by-laws of JNESO do not prohibit a director of JNESO, who, of course, may not be a supervisor, from being a director of NJSNA, but a director of NJSNA who is a supervisor may not be a director of JNESO. Then, too, the by-laws of JNESO do not prohibit an officer thereof from being an officer of NJSNA or vice versa, so long as the qualifications for membership in JNESO are met.
Funds for the operation of JNESO are derived entirely from NJSNA, and JNESO has no independent source of income. All salaried personnel working for JNESO are and have been on the paid staff of NJSNA.
However, even though JNESO's by-laws exclude from membership nurses holding administrative or supervisory positions, there are presently two of eight directors of JNESO who appear to have some attributes of supervision.
In 1957 NJSNA was certified by the N.L.R.B. as bargaining representative for nurses employed at one of Humble Oil Company's plants here in New Jersey; collective bargaining was undertaken and a collective bargaining contract was entered into, which contract however is no longer in effect. In 1969 Essex County consented to a unit, which NJSNA sought to represent, consisting of all registered nurses employed by Essex County except supervisors as defined in the Employer-Employee Relations Act of 1968, but would not consent to a recognition of NJSNA. The New Jersey Public Employment Relations Commission conducted an election, and after the election, which was won by NJSNA, certified the Association as the majority's selection as collective bargaining agent by a certification of representation dated November 12, 1969. Thereafter NJSNA and Essex County entered into a collective bargaining agreement dated June 10, 1970 under which NJSNA was recognized as the exclusive collective bargaining representative of the registered professional nurses employed by Essex County, excluding supervisors, as that term is defined in the Employer-Employee Relations Act of 1968.
*269 On June 1, 1970 a local unit of NJSNA and the Board of Chosen Freeholders of Union County entered into a collective bargaining agreement under which the employer recognized the local unit of NJSNA as the exclusive collective bargaining representative of the registered professional nurses employed by the county in supervisory positions, as that term is defined in the Employer-Employee Relations Act of 1968. At or about the same time JNESO and the freeholders of Union County entered into a collective bargaining agreement which recognized the Union County local unit of JNESO as the exclusive collective bargaining representative of the registered professional nurses employed by the county in nonsupervisory positions.
The Newark Public School Nurses Association, a local unit of NJSNA, and the Newark Board of Education entered into a collective bargaining agreement dated August 25, 1970 under which Newark recognized the local unit of NJSNA as the exclusive representative of the registered professional nurses employed by the Board as nonsupervisory nurses, as that term is defined in the Public Employees Relations Act of 1968. Similarly, the Lakewood Board of Education has recognized the Association as collective bargaining agent for the Lakewood School nurses.
JNESO lost an election in 1970 in Trenton's Helene Fuld Hospital when it sought to be selected as collective bargaining representative for the general duty staff nurses and head nurses at that hospital. Although there is a nursing school at the Helene Fuld Hospital, no attempt was made to separately organize its faculty.
At Elizabeth General Hospital NJSNA sought to represent two separate units, the general duty staff nurses and head nurses on the one hand, and the faculty of the School of Nursing on the other hand. Litigation ensued in 1969, and in 1970 NJSNA took a voluntary dismissal inasmuch as there had been material employee turnovers affecting majority status in both the faculty and nonfaculty units.
*270 It would appear that at the present time there are no collective bargaining contracts in force between NJSNA or JNESO and either a private nonprofit or profit-making employer, nor is there any indication that either NJSNA or JNESO ever, as collective bargaining agent, represented a bargaining unit comprised only of the members of the faculty of a hospital's school of nursing. The bargaining contracts that are in force and were entered into either by the Association or JNESO are all contracts entered on behalf of public employees under the Employer-Employees Relations Act of 1968 which implements the public employment provision of Art. I, par. 19 of the New Jersey Constitution.
Said agreements were negotiated by one John Harper, Director of the Economic Security Program of NJSNA and Director of JNESO; and while, as such, he was directly responsible to the officers and board of directors of NJSNA or JNESO, the officers and the board of directors of the respective organizations involved never acted upon nor were they required to act upon said agreements. It is clear that at no time was Harper ever given bargaining mandates by the board of either the Association or JNESO. On the contrary, all such mandates and bargaining objectives came from the employees within the local unit he was representing at the time of a particular negotiation.
As pointed out above, it is defendant's contention that neither the Association nor JNESO is such an organization as is entitled to recognition or to the rights and privileges of Art. I, par. 19 of the New Jersey Constitution, since they consist of supervisory and nonsupervisory personnel and are dominated and controlled by nurses in supervisory positions in their respective employments. However, the court has already noted that JNESO, with perhaps one or two exceptions, does not contain any supervisory personnel, as the term "supervisor" is defined by the New Jersey Public Relations Act and Johnson v. Christ Hospital, supra.
*271 In the absence of implementing legislation and controlling case law, this court must look to the body of labor law which has developed in other jurisdictions for standards and rules to apply in interpreting Art. I, par. 19 of the New Jersey Constitution.
The Labor Management Relations Act of 1947, 29 U.S.C.A. § 141 et seq., provides in section 2 (29 U.S.C.A. § 152(5)):
The term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.
In Independent Circulation Union v. Item Company, 163 F. Supp. 399 (E.D. La 1958), the court said:
It is also clear that the definition of labor organization under the Act is very broad and has been construed even more broadly by the Courts. So that now, almost any group which negotiates with the management concerning wages and working conditions of employees is a labor organization.
See also, N.L.R.B. v. Cabot Carbon Co., 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175 (1959).
While under the federal act and the acts of some states, supervisors do not have the right to organize and engage in collective bargaining negotiations, nevertheless the inclusion of supervisors within a labor organization does not thereby render such an organization ineligible to function as a "labor organization." International Organization of Masters, Mates and Pilots of America, Inc., 144 N.L.R.B. 1172, 54 LRRM 1209 (1963), aff'd 122 U.S. App. D.C. 74, 351 F.2d 771 (D.C. Cir.1965); International Paper Co., 172 N.L.R.B. 100, 68 LRRM 1360 (1968). In International the National Labor Relations Board held that the Alabama Nurses' Association, whose constitution, by-laws *272 and operating procedures are similar to those of NJSNA, was in fact a labor organization and that the presence of supervisors therein did not disqualify it as such organization. See also Pacific Far East Line, Inc., 174 N.L.R.B. No. 172, 70 LRRM 1405 (1969); Buckeye Village Market, Inc., 175 N.L.R.B. No. 46, 70 LRRM 1529 (1969); Great Lakes Towing Co., 168 N.L.R.B. No. 87, 67 LRRM 1115 (1967); Graham Transportation Co., 124 N.L.R.B. No. 131, 44 LRRM 1568 (1959); National Labor Relations Board v. Edward G. Budd Mfg. Co., 169 F.2d 571 (6 Cir.1948), cert. den. Foreman's Ass'n of America v. Edward G. Budd Mfg. Co., 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441 (1949).
The Board in the International Paper Co. case involving the Alabama Nurses' Association stated:
Although Petitioner does have supervisors as members and supervisors serve on the Board of Directors the record indicates substantial participation by the employee members in the affairs of Petitioner, and that no Employer supervisors or employees are presently serving on the Board of Directors. Further, we note that Petitioner stated, in uncontroverted testimony, that should it be certified, goals and negotiations involving the unit herein would be determined and pursued solely by members of the unit.
The court notes that in the case at bar the evidence clearly establishes that "goals and negotiations involving the unit" have been and will be determined solely by members of the unit. As a matter of fact, the uncontradicted testimony, to which the court gives credence, establishes that this has been the situation with respect to the other units in New Jersey that negotiated the contracts referred to above and which negotiations also tend to establish labor organization status. Incidentally, the court notes that NJSNA has been filing as a union pursuant to the requirements of the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin), 29 U.S.C.A. § 401 et seq., for more than ten years.
*273 Of course, as defendant points out, there are some states which by legislation have made it unlawful for any executive, administrative or supervisory employee to be a member in, or to be accepted for membership by, any labor organization the constitution and by-laws of which permit membership to employees in capacities other than executive, administrative or professional or supervisory, or which is affiliated with any labor organizations which permit membership to such employees. However, although the New Jersey Employer-Employee Relations Act, N.J.S.A. 34:13A-1 et seq., is not specifically applicable to the case at bar, it nevertheless is useful in assisting the court in determining whether an organization which has supervisors within its membership can, under New Jersey law, qualify as a labor organization. N.J.S.A. 34:13A-5.3 provides, in pertinent part:
[N]or * * * shall any supervisor having the power to hire, discharge, discipline, or to effectively recommend the same, have the right to be represented in collective negotiations by an employee organization that admits nonsupervisory personnel to membership, and the fact that any organization has such supervisory employees as members shall not deny the right of that organization to represent the appropriate unit in collective negotiations; * * * (Emphasis supplied).
It would appear that our policy, as set forth by the New Jersey Legislature, is not to disqualify an organization from functioning as the collective bargaining representative of nonsupervisory employees because of the fact that there might be supervisors included within its membership. Rather, it would appear that the only prohibition under the New Jersey act is that supervisors not be included within the same unit as nonsupervisors. N.J.S.A. 34:13A-6(d) (1). See also, In re Wyckoff Heights Hospital, 27 S.L.R.B. 75 (N.Y. 1964).
In Johnson v. Christ Hospital, 84 N.J. Super. 541 (Ch. Div. 1964), the trial court, in considering the appropriate *274 bargaining unit for the group of nonprofessional employees involved, stated:
The organizational activities of the Union may be directed to all employees of defendant, except doctors (including residents and interns), registered nurses, licensed practical nurses, all professional employees (including those whose occupation requires a license for the practice of a profession), and all supervisory employees who have the authority to hire, or discharge, or effectively recommend the discharge of employees. [at 568]
The Public Employment Relations Commission on August 28, 1970, in South Plainfield Board of Education and the New Jersey State Nurses' Association and the South Plainfield Education Association (P.E.R.C. No. 46), held that the Nurses' Association was an employee representative under the act.
As stated above, it might be said that under the Employer-Employee Relations Act it has been indicated there is no prohibition against the inclusion of both supervisors and nonsupervisors in the same labor organization so long as the unit sought is an appropriate unit for purposes of collective bargaining, which, of course, could not include supervisory personnel therein.
And yet, in the case of Lamena v. Camden Local No. 396, 80 N.J. Super. 203 (App. Div. 1963), it was held:
The normal collective bargaining process between completely independent coordinate parties or their representatives is, by the history of labor-management relations over the past 30 years or more, the method best designed to achieve industrial harmony because democratic in nature and best calculated to lead to fair resolution of differences with adequate recognition of the legitimate interests and requirements of both sides of the bargaining dichotomy. This now universally accepted fundamental is the cornerstone of our labor law and practice, both state and federal. Supporting authority is so abundant and self-evident as not to require citation. [at 211]
Then again, 29 U.S.C.A., § 164(a) provides:
Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, *275 but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, even national or local, relating to collective bargaining.
I have already found that nurses in supervisory positions have dominated the board of directors of the Association, even though nonsupervisory nurses are eligible for positions on the board. Notwithstanding the large number of supervisors within the Association and on its board, the local unit in this case (the faculty nurses) has requested the Association in the first instance, and then, in the alternative, Jersey Nurses' Economic Security Organization, to act as collective bargaining agent. JNESO was formed as a separate but component part of the Association, specifically for the purpose of helping nurses achieve economic security. The court notes in passing that perhaps, and not inconceivably, it was formed to overcome the possible objections to the supervisor-nonsupervisor dichotomy. In any event, JNESO has its own board of directors, its own officers, its own by-laws and its own programs. Supervisors are not eligible for membership, albeit there is a possibility that some few supervisors have been admitted to membership because of the confusion regarding the definition of "supervisor" in New Jersey. It is clear that as members of JNESO are promoted to supervisory positions their membership is terminated.
Defendant contends there is a significant dependency relationship between JNESO and its parent organization NJSNA; that there is no prohibition against a director of JNESO also being a director of the Association, and similarly no prohibition against an officer of JNESO also being an officer of the Association. It also points out that JNESO's budget must be approved and implemented by the board of directors of the Association. Additionally, defendant states there is a liaison committee with NJSNA consisting of four officers from each organization; that any member of the Association may become a member of JNESO simply by completing an application form, and *276 that there is no need to pay any additional membership fees or dues to meet any requirements beyond the initial "nonsupervisory" qualification. However, as opposed to the contentions of defendant, the court has already found that neither NJSNA nor any of its supervisory members has in the past or will in the future participate in the collective bargaining activities of local units.
In view of all of the foregoing, it is the court's conclusion that NJSNA is not disqualified from acting as a labor organization and bargaining representative of a nonsupervisory group of employees such as the nursing faculty ate for collective bargaining purposes. Then, too, defendant many supervisors within its membership. However, it is the court's further conclusion that the spirit and intention of Art. I, par. 19 of the New Jersey Constitution may best be advanced, insofar as plaintiffs are concerned, by the Jersey Nurses' Economic Security Organization since said representation will further guarantee that the collective bargaining process will be between "completely independent coordinate parties or their representatives."
Having determined that JNESO is entitled to recognition and to the rights and privileges of Art. I, par. 19 of the New Jersey Constitution, the court must now determine whether the registered nurses on the faculty of the Hackensack Hospital School of Nursing constitute an appropriate unit.
Defendant contends that it is under no obligation to bargain collectively with plaintiffs since the proposed bargaining unit itself, that is the nursing faculty, consists of supervisory and nonsupervisory personnel and is thus inappropriate for collective bargaining purposes. Then, too defendant further argues that only a broader bargaining unit, i.e., one consisting of all professional service, nonsupervisory personnel, or at least one composed of all nonsupervisory registered nurses (faculty and nonfaculty), is appropriate on the basis of the existing mutuality of interests and wages, hours and working conditions.
*277 As pointed out by defendant, it is well established under federal law that employers are under no obligation to bargain with a union if the bargaining unit includes supervisors. N.L.R.B. v. Metropolitan Life Ins. Co., 405 F.2d 1169 (2 Cir.1968); Warner Co. v. N.L.R.B., 365 F.2d 435 (3 Cir.1966). The National Labor Relations Board, in Continental Baking Co., 99 N.L.R.B. 123, 30 LRRM 1119 (1952), set forth the criteria to be used in determining an appropriate bargaining unit as follows:
First and foremost is the principle that mutuality of interest in wages, hours, and working conditions is the prime determinant of whether a given group of employees constitute an appropriate unit. In deciding whether the requisite mutuality exists, the Board looks to such factors as the duties, skills and working conditions of the employees involved and especially to any existing bargaining history.
Said criteria have basically been adopted in New Jersey through the medium of N.J.S.A. 34:13A-5.3, which states in part: "The negotiating unit shall be defined with due regard for the community of interest among the employees concerned * * *." Then, too, in determining the appropriateness of the unit sought by plaintiffs, the test is not whether the unit sought is the most appropriate unit possible, but rather whether said unit is in fact an appropriate unit. See, for example, Morand Bros. Beverage Co., 91 N.L.R.B. No. 58, 26 LRRM 1501 (1950), where the National Labor Relations Board stated:
There is nothing in the statute which requires that the unit for bargaining be the only appropriate unit or the ultimate unit, or the most appropriate unit; the Act requires only that the unit be "appropriate." It must be appropriate to ensure to employees, in each case "the fullest freedom in exercising the rights guaranteed by this Act" * * * [Appropriate] carries with it no overtones of the exclusive or the ultimate or the superlative." [Emphasis the Board's]
It follows that merely because other units may be appropriate does not mean that the unit sought is inappropriate. N.L.R.B. v. New Enterprise Stone and Lime Co., 413 F.2d 117 (3 Cir.1969). In Haag Drug Company, *278 169 NLRB No. 111, 67 LRRM 1289 (NLRB 1968), the Board said: "It is elementary that more than one unit may be appropriate among the employees of a particular enterprise * * *."
I agree with plaintiffs that the term "community of interest," insofar as it applies to the criteria for determining a bargaining unit, relates to job function rather than job title or profession, and that merely because several persons are registered nurses does not mean that they necessarily share the same community of interest. I further agree that "what they do, where they do it, with whom they function and other similar factors must obviously be considered."
As indicated above, defendant also argues that the unit sought is inappropriate because it includes within it employees who are coordinators, it being defendant's position that said coordinators are "supervisors."
N.J.S.A. 34:13A-6(d) provides: "No unit shall be appropriate which includes (1) both supervisors and nonsupervisors." Plaintiffs concede that if in fact the coordinators are "supervisors," they must be excluded from the unit, but they take the position that assuming all other qualifications are fulfilled, the court should order bargaining to commence with the unit sought, excluding those employees found to be supervisors.
The National Labor Relations Act defines "supervisor" as follows:
The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment. [29 U.S.C.A. § 152(11).]
The New Jersey statute does not define "supervisor." However, N.J.S.A. 34:13A-5.3 does refer to "any supervisor *279 having the power to hire, discharge, discipline or to effectively recommend the same." Hence, if a particular individual has authority to effectively recommend the hiring, discharging or disciplining of an employee, such individual would be a "supervisor" and would not lose such status as a supervisor by performance of nonsupervisory work during his working time. Morrison v. Shopmen's Local 682, 114 F. Supp. 54 (D.C. Ky. 1953); Ideal Roller and Mfg. Co., 104 N.L.R.B. 931 (1953).
As of the time of trial there were 21 registered nurses on the faculty of the Hackensack School of Nursing. The faculty is organized into four teaching teams, each responsible for a certain aspect of the curriculum. The job description of coordinators, of which there are four on the faculty of the School of Nursing, sets forth that such coordinators have the responsibility of assuming leadership over a team of instructors for a particular part of the curriculum, etc.
There was a sharp conflict in the testimony at the trial as to the authority and responsibility of said coordinators, but the court having heard the testimony of the various witnesses, including the coordinators, gives full credence to the testimony of the witness Janet Rubino, formerly a plaintiff in this action, but now serving as Director of the School of Nursing, and finds that the coordinators do have the power to effectively recommend hiring, firing and disciplinary action, transfers from one team to another, as well as promotions through the evaluation of instructors, and to direct members of their teams. Consequently, said coordinators are not eligible for inclusion in the bargaining unit sought by the plaintiffs since they would clearly fall within the definition of supervisor.
Prior to September 3, 1968, the date on which the individual contracts were executed by members of the faculty of the School of Nursing, the faculty members and all other registered nurses employed by defendant hospital were governed by exactly the same personnel policies. Generally speaking, the employees' handbook, as supplemented by hospital *280 regulations and personnel regulations issued by the hospital to its employees, set forth the personnel policies and working conditions applicable to both the members of the faculty and all other registered nurses employed by the hospital. The form of contract signed by the individual members of the faculty on September 3, 1968 provided that "Except as otherwise expressly provided herein, hospital regulations and personnel regulations currently in effect will continue to be applicable to all faculty members."
The contract was executed for the academic year 1968-1969 by all of the members of the faculty (including coordinators) except the Director of the School of Nursing. A similar form of contract was offered for the academic year 1969-1970 to all of the members of the faculty except the Director of the School of Nursing and the four coordinators, the coordinators being offered letters of appointment because of a determination by the hospital that they were members of management and supervisors, as the hospital interpreted the National Labor Relations Act. Be that as it may, it is defendant's position that despite these individual contracts, the hospital at no time has recognized the association as a labor organization or bargaining representative, but rather that NJSNA was acting only as a professional association and assisting certain members thereof in securing the individual contracts executed by the nursing faculty members.
The contracts for the year 1969-1970 were executed by only five members of the faculty because the hospital would not recognize NJSNA as collective bargaining agent for the faculty, which recognition was requested by them. Only two members of the faculty have executed individual employment contracts for the academic year 1970-1971. However, any member of the faculty who did not execute an individual form of contract was treated by the hospital, and has been treated by the hospital, as if she had, in fact, signed such a contract.
None of the nurses on the faculty is below pay grade 11. Seven are pay grade 12, five are grade 13 and four are *281 grade 14, whereas of the remaining 386 registered nurses employed by the defendant, 321 (or 83% thereof) are in pay grades 9 and 10. Of the 36 registered nurses at Hackensack Hospital that are pay grade 13, other than four or five instructors from the faculty, all are head nurses, which is a supervisory position. Six registered nurses are instructors or assistant instructors attached to Staff Development and serve under a registered nurse director.
Faculty nurses have a five-day work week from Monday through Friday and work only on the day shift. Substantially all other registered nurses are required to work rotating shifts; in addition, their work week includes Saturday and Sunday, there being a shift premium for the evening and night shift.
No faculty instructor is required to work more than ten hours a week in the classroom, nor more than 18 hours a week in clinical areas, so that each faculty member spends at least 12 hours a week preparing for instruction in both the classroom and the clinical areas of the hospital proper. Although faculty members may be required to be at the hospital 40 hours a week, it is clear that their work hours are not at all similar to any other group of registered nurses. Because of the difference in the nature of their jobs, faculty nurses are not required to punch time clocks, whereas most of the other registered nurses are required to do so.
Vacation policy, with respect to the faculty nurses, is considerably different from that which applies to all other registered nurses for, in addition to quantity, the faculty must take their vacations during August when the School of Nursing is closed. The School of Nursing, in which the faculty members spend most of their time, either in class or in their individual offices preparing for instruction, is physically separate and apart from the hospital where the other registered nurses spend all of their time.
There is a separate budget for the School of Nursing and also for all other departments which employ registered nurses. Faculty members are entitled to the same number *282 of holidays as the other nurses, but there is a difference as to when they are taken due to the specific requirements caused by the curriculum. Sick leave policy applicable to the faculty members is different from that which applies to the other nurses, and there are variances in the grievance procedure which are available to the nursing faculty. Faculty nurses are not required to wear uniforms, whereas other registered nurses must do so.
However, the basic differences between the faculty nurses and all other registered nurses may be found in their primary job functions. The primary job function of the nursing faculty is to teach and educate, not to give patient care either directly or otherwise.
As distinguished from most other nursing positions, all faculty members are required either to have a degree or to matriculate in a program leading to a degree. Significantly, the court notes that the individual contracts which were entered into by the hospital with the faculty nurses did not affect the operation of the hospital and resulted in no disruption of normal hospital services.
The nurses who act as instructors in Staff Development report to a Mr. Gott, the Director of Personnel, not to Mrs. Rubino, the Director of the School of Nursing. Their function, which may perhaps best be characterized as training and informing, has traditionally been a function of personnel management. All new employees, including maintenance people, attendants, practical nurses, etc., are given training and instruction in various phases of hospital operations by the Staff Development registered nurse instructors. The services they perform, the terms and conditions of their employment, and their day-to-day problems vary in many respects from those of the nursing faculty. Gott, their Director, has no authority or control with respect to the activities of the nursing faculty and conversely, Mrs. Rubino has no authority or control over Staff Development nurses. In the course of their employment the Staff Development instructors are not in the School of Nursing building nor *283 in the clinical areas of the hospital, so that there is no contact between the faculty nurses and the Staff Development nurses except possibly when a faculty nurse might be taking a course offered by Staff Development. While it is true that on occasion faculty members have left their positions, as such, to work in another part of the hospital, and nonfaculty registered nurses have become a part of the faculty, some instructors in the School of Nursing having been recruited from among the other registered nurses in the hospital, the court anticipates no difficulties which might arise from the creation of a separate bargaining unit for the faculty nurses as a result of this interchange.
Further indication that the faculty nurses comprise a separate and homogeneous group with their own objectives and problems is the fact that there is an organization known as the Hackensack Hospital School of Nursing Association. No registered nurses, other than those on the faculty, are members of this association. Then, too, the faculty meets regularly as a group, and at these meetings curriculum and other school problems are discussed. No nurses, other than those on the faculty, attend these meetings.
The terms and conditions of employment of a nurse involved with direct patient care are obviously different from those employed in the School of Nursing. For example, a staff nurse is concerned with the number of patients for whom she is responsible, rotation with respect to working shifts and weekends, scheduling of work with others in direct patient care, equalization of overtime with other nurses in direct patient care, the establishing of lines of responsibility between herself and practical nurses, attendants, orderlies, doctors, pharmacists, etc., none of which problems concerns a faculty nurse.
Comparison of the job descriptions for staff nurse, for Staff Development nurses and nursing faculty delineate the differences in job functions.
*284 Of course, the hospital employs many technical and professional people other than registered nurses, such as licensed practical nurses, psychologists, medical technologists, X-ray technicians, radio-isotope technicians, pharmacists, physical therapists, psychiatric social workers, medical social workers, occupational therapists, social group workers, dieticians, inhalation therapists, medical record librarians, physicists, electrocardiographic technicians, occupational therapy aids, operating room technicians and cardio-pulmonary technicians. Many of these professional and technical employees are required to be graduates of post-secondary educational schools or have satisfactory equivalent training and experience in a particular field, and many of them must have special educational background and experience in dealing with special problems or special patient therapy. Many of them must be registered or licensed, and some are graded for salary purposes in grades comparable to those of the members of the nursing faculty. In addition, the hospital employs service and maintenance personnel as well as office and clerical employees of all types and categories.
It is defendant's position that a hospital is composed of a myriad of specialized departments and professional service classifications, and a holding that the nursing faculty constitutes an appropriate bargaining unit would result in the creation of separate bargaining units and compartmentalize labor relation policies in each of these departments and classifications, which would inevitably complicate labor relations, resulting in possible strikes and other forms of unrest, thereby seriously impairing the hospital's ability to provide crucial health services to the community.
In support of this contention, defendant states that the National Labor Relations Board has shown a tendency, sub silentio, in accepting jurisdiction over institutions of higher education where the public interest is involved, to find broad collective bargaining units, where there is a sufficient showing of a mutuality of interest within that broad unit, despite evidence of mutuality in a narrower *285 unit, citing Yale University, 184 N.L.R.B. No. 101 (1970); Cornell University, 183 N.L.R.B. No. 41 (1970).
In New York University, 32 S.L.R.B. No. 89 (N.Y. 1969) the New York State Labor Relations Board held likewise stating:
Accordingly, as a matter of general policy and in the public interest, we do not deem it desirable or necessary to compartmentalize educational institutions into numerous small bargaining units anymore than is clearly and cogently required by the totality of the facts and circumstances presented. In reaching this determination, we have duly and fully weighed and evaluated the twin statutory objections of encouraging collective bargaining and maintaining stability in labor relations.
Similarly, the New York Board has stated as a matter of policy its opposition to an over-compartmentalization of hospitals into numerous small bargaining units. Wyckoff Heights Hospital, 27 SLRB 75, 82 (1964); St. John's Queens Hospital, 26 SLRB 529, 532 (1963); Arthur Casson and Iris Casson, 26 SLRB 395 (1963), 26 SLRB 484 (1963). See also Flushing Hospital and Dispensary, 26 SLRB 445 (1963); Hospital for Joint Diseases, 27 SLRB 199 (1964); The Long Island College Hospital, 27 SLRB 45 (1964); Wyckoff Heights Hospital, 27 SLRB 775 (1964).
Typically, in St. John's Queens Hospital, supra, the New York Board ruled that the appropriate unit for collective bargaining purposes was one comprised of all service and maintenance employees of the hospital, a unit which was considerably broader than that proposed by the plaintiffs in that case, stating:
As a matter of general policy, we do not deem it desirable to compartmentalize hospitals into numerous small bargaining units any more than is necessary. The duties, responsibilities, qualifications, working conditions, earnings and training of the ambulance drivers and attendants are not sufficiently different from those of the maintenance and service employees to warrant placing them in a separate unit here. [26 SLRB at 532 (1963).]
*286 Query? Are the differences between the duties, responsibilities, qualifications, working conditions, earnings and training of members of the nursing faculty and those of other registered nurses in Hackensack Hospital, and more particularly the Staff Development nurses, such as to warrant placing them in a separate unit?
The facts as I have found them to be establish that the nursing faculty have significantly different educational qualifications, training, skill, experience, wage scales, interests, duties and responsibilities from the other registered nurses and personnel at the hospital with the possible exception of the Staff Development nurses. The Staff Development nurses are teachers whose main objective is continuing in-service education to all employees, including faculty and nonfaculty registered nurses, to keep them abreast of changing technology; just as do members of the nursing faculty, they work Monday to Friday, do not punch time clocks, need not wear uniforms, and can wear street clothes or lab coats, and have their offices and classrooms in a separate building of their own. As pointed out above, they are sometimes called upon to instruct members of the faculty in various matters, for example, coronary care. Six of the seven members of the Staff Development Department either have a degree or are enrolled in a program leading to a degree.
The court recognizes the philosophy of the decisions cited by defendant against fragmentation. But it is likewise mindful that under the federal act the extent of union organization may be considered as a factor in determining an appropriate unit, although it cannot be the controlling factor. N.L.R.B. v. Metropolitan Life Ins. Co., 380 U.S. 438, 85 S.Ct. 1061, 13 L. Ed 2d 951 (1965) Then, too, community of interest is an important concept in determining an appropriate bargaining unit to the extent that it groups employees who, in collective bargaining, would be interested in similar bargaining objectives. As found above, the nursing faculty in collective bargaining negotiations *287 would be concerned with demands unlike any other group of nurses or employees.
Some of the elements which go to make up a community of interest are the functions performed by employees, similarity as to skills, wages, benefits and hours. See Decision, Inc., 166 NLRB No. 41, 65 LRRM 1660 (NLRB 1967), where the Board also considered the fact that the employees generally dressed similarly, punched one time clock, and performed their jobs in the same physical facilities. In Bowman Transportation, Inc., 166 NLRB No. 111, 65 LRRM 1716 (NLRB 1967), there was separate immediate supervision for employees within the unit, as opposed to those employees outside the unit, and there was no interchange between employees within and without the unit. Of critical importance in the case at bar is that the duty of the nursing faculty is primarily to teach, whereas the duty of nurses in the hospital proper is to administer direct patient care; hence, their functions are completely different. There is no doubt that the nursing faculty possesses a clear community of interest.
While conceivably the community of interest could be found to encompass employees other than the nursing faculty members, such conclusion would simply reveal the existence of other "appropriate units." Such finding, however, would not and does not preclude the appropriateness of a unit consisting of only the faculty nurses. Plaintiffs have established that they constitute an appropriate unit (excluding coordinators). They are not required to seek representation in the most appropriate unit. Morand Bros. Beverage Co., Haag Drug Co., and N.L.R.B. v. New Enterprise Stone and Lime Co., all supra.
In New Jersey, as under the Taft-Hartley Act, the unit must be defined with "due regard for the community of interest among the employees concerned." N.J.S.A. 34:13A-5.3; Board of Education, West Orange v. Wilton, 57 N.J. 404 (1971). It would follow that all nurses whose duties are concerned mainly with patient care would constitute *288 an appropriate unit unto themselves. University Hospital, 60 LRRM 1508 (1965).
There is no "unity of interest," "dependent operation" or "sameness in character of work and unity of labor relations" between the nursing faculty and any other hospital nurses, with the possible exception of the Staff Development nurses. Therefore they alone are an appropriate unit, Board of Education of West Orange v. Wilton, supra, 57 N.J. at 420. The court finds that the nursing faculty has and will "operate cohesively as a unit," which is further evidence that it is an appropriate unit. Board of Education, West Orange v. Wilton, at 412.
The Taft-Hartley Act, in section 9, specifically authorizes the establishment of a "subdivision" of a "plant unit," and in determining whether a certain group of employees constitute an appropriate unit there should be considered whether the proposed unit consists of employees with distinct and homogeneous skills, whether they constitute a functionally distinct department, and the degree of integration of the employer's "production processes," including the extent to which the continued normal operation of such production processes is dependent upon performance of the assigned functions of the employees in the unit sought. Mallinckrodt Chemical Works, 162 NLRB No. 48, 64 LRRM 1011 (Bd. 1966). The operations of the hospital and its patient care are not dependent upon the faculty of the School of Nursing to an extent that would preclude their constituting an appropriate unit.
Particularly significant in determination of an appropriate bargaining unit is the fact that the totality of evidence adduced at the trial gave no indication whatsoever that any other group of employees or any other nurses, including the Staff Development nurses, desired to participate in collective bargaining at this time. On the contrary, only the faculty nurses wish to be represented for purposes of collective bargaining. See Long Island College Hospital, 27 SLRB 405, *289 410 (N.Y.), and Hayes Seventy-Third Corp., 26 SLRB 428, 429-431.
For the reasons set forth above, it is the court's conclusion that the registered nurses on the faculty of the Hackensack School of Nursing, with the exception of the coordinators, constitute an appropriate unit for bargaining purposes. (Had the Staff Development nurses manifested any interest in collective bargaining they might properly have been included within such bargaining unit.)
At the trial all but two of the nurses within the nursing faculty unit appeared voluntarily and testified that they wished to be represented in collective bargaining negotiations by either the New Jersey State Nurses' Association or the Jersey Nurses' Economic Security Organization. There is no doubt that the faculty nurses at the hospital went to the Association for assistance, and the testimony clearly establishes, and the court finds, that the Association did not come into the hospital and "organize" them.
Defendant hospital contends this court should not enter a bargaining order since a proper election has never been held in the unit; that in labor matters the only effective means of assuring an employee of his right to freedom of choice in selecting a bargaining agent is an election by secret ballot; that the faculty members should not be denied their right to make a choice, free from recrimination on the part of anyone, especially their peers with whom they work so closely on a day-to-day basis.
However, it would appear that in New Jersey trial testimony and exhibits with respect to the number of persons actually desirous of joining a union, and designating it as the collective bargaining representative, is a valid means of demonstrating majority status. In Johnson v. Christ Hospital, 84 N.J. Super. 541, 567 (Ch. Div. 1964), aff'd 45 N.J. 108 (1965), the trial court ordered that an election be held because it concluded that the testimony and exhibits left a great deal of uncertainty with respect to the union's majority status and because the atmosphere in *290 the hospital with respect to unionization was not conducive to the voluntary selection or rejection of the union by the employees. Here the testimony is clear and convincing and leaves no uncertainty, nor was there present any of the "atmosphere" which prevailed in Johnson.
Because of the uncertainty, Judge Matthews held in Johnson:
Under such circumstances, it is apparent that a valid determination as to the desires of the employees with respect to unionization is presently incapable of accurate ascertainment, unless each employee is subpoenaed before the court to testify as to his choice in the matter. The time consuming and cumbersome nature of such a procedure should be obvious. The only alternative which can lead to the accuracy desired, is a representation election under the supervision of this court. [84 N.J. Super. at 567]
It is apparent that the large number of employees involved led Judge Matthews to conclude that it was not feasible to subpoena everyone who was eligible to vote in an election to come to court to testify as to his choice in the matter. It would appear that such method to ascertain majority status would have been utilized if only a small number of employees were involved.
This court, having considered the relatively few employees in the unit sought and the brief amount of testimony required from each of them, permitted plaintiffs to proceed in that manner. The procedure was not cumbersome and was concluded with speed and dispatch.
Plaintiffs, as I have stated, demonstrated their majority status by the direct testimony of an overwhelming majority of the employees within the bargaining unit sought to be recognized. Those few members of the nursing faculty who testified that they were pregnant and would in the future be taking maternity leaves of absence with no assurance of re-employment, even if ineligible to vote, would still leave plaintiffs with a comfortable majority. However, it is my opinion that since those nurses were employees at the time of trial their testimony with respect to majority status *291 should be considered. Sioux City Brewing Co., 85 NLRB No. 194, 24 LRRM 1534 (Bd. 1949).
In Otarion Listener Corp., et al. and Local 1783, International Brotherhood of Electrical Workers, 124 NLRB No. 109, 44 LRRM 1514 (1959), the Board held that in a union election it was immaterial, with respect to the eligibility of an employee, that the employee may have intended to quit her job after the election. So long as one is an employee at the time of the election, she has a right to vote. Likewise, in Personal Products Corp. and Textile Workers Union of America, 114 NLRB No. 150, 37 LRRM 1079 (1955), it was held that an employee who is employed on the eligibility date and whose tenure of employment remains uncertain is nevertheless eligible to vote.
Persons on temporary layoff remain employees and thus are eligible to vote in National Labor Relations Board elections unless it is clearly shown that the employment relationship has been severed. See Trailmobile Division, Pullman, Incorporated v. NLRB, 379 F.2d 419 (5 Cir.1967), where the court said that "an employee on leave of absence generally continues to be regarded as an employee unless it can be established by overt action or objective evidence that the employment relationship has been severed." Two of the faculty nurses were on temporary leaves of absence when they testified, but the court finds that their employment relationship had not been severed and therefore they properly were permitted to testify on the question of majority status. See also, Bear Brand Hosiery Co., 100 NLRB No. 231, 30 LRRM 1451 (1952).
It having been determined that the four coordinators are supervisors and hence cannot be members of the bargaining unit, total membership thereof is reduced to 17 and majority status may be established by the favorable testimony or vote of only nine of the faculty nurses. This fact rendered moot the issues of whether those nurses within the bargaining unit who were on leaves of absence were eligible to vote, and whether nurses presently employed within the unit *292 sought were eligible to vote if they would be taking leaves of absence in the near future. The court has ruled in favor of such eligibility, but majority status would not have been affected even if it had ruled otherwise.
Defendant Hackensack Hospital has further contended that the court should not issue a bargaining order without an election since, were the court to do so, it would deprive the employer hospital of an opportunity to make its views known to these employees. Such argument was discussed in NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), which involved authorization cards. While the court's rejection of such argument was there largely predicated on the employer's unfair labor practices, it did point out that the employer was aware of the organization drive at its very outset and thus had ample time to make its views known.
Here, the hospital was aware as far back as May 1969 of the wishes of the faculty nurses to have New Jersey State Nurses' Association as their collective bargaining representative, so that it had almost two years to make its views known to its employees. The filing of this action certainly could leave no doubt in defendant's mind as to the plaintiffs' objectives. It is my opinion that the circumstances in this case are such and the testimony of the individual nurses as to their wishes so convincing, an election is not necessary nor warranted.
Having concluded that the nursing faculty, with the exclusion of the coordinators, is an appropriate bargaining unit, and that a majority of nurses within the unit wish to be represented for purposes of collective bargaining by the Jersey Nurses' Economic Security Organization, it is the further conclusion of this court that defendant Hackensack Hospital bargain with the nursing faculty through their collective bargaining representative, Jersey Nurses' Economic Security Organization, with respect to hours, wages and other conditions of employment.
*293 The evidence presented at the trial having failed to establish the commission by the hospital of any unfair labor practices, plaintiffs' claims of such unfair labor practices are dismissed.
Appropriate form of Judgment in accordance with R. 4:42 will be submitted.