**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ANNAPOLIS EMERGENCY HOSPITAL ASSOCIATION, INC., d/b/a Anne Arundel General Hospital, Respondent.**

No. 76–1166.

United States Court of Appeals, Fourth Circuit.

Argued June 6, 1977.*

Decided Aug. 31, 1977.

---

* Argued initially on October 7, 1976, before a panel consisting of WINTER, CRAVEN and HALL, Circuit Judges.

Richard A. Cohen, Atty., N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Aileen A. Armstrong, Atty., N. L. R. B., Washington, D. C., on brief), for petitioner.

N. Peter Lareau, Baltimore, Md. (A. Samuel Cook, Christopher H. Mills, Venable, Baetjer & Howard, Baltimore, Md., on brief), for respondent.

Herbert J. Belgrad, Kaplan, Heyman, Greenberg, Engelman & Belgrad, Baltimore, Md., on brief, for amici curiae.

Before HAYNSWORTH, Chief Judge, and WINTER, BUTZNER, RUSSELL, WIDENER and HALL, Circuit Judges, sitting in banc.

WINTER, Circuit Judge:

This case was argued initially before a panel of the court and the late Judge Craven prepared an opinion in which Judge Hall concurred. Judge Winter prepared a dissenting opinion. Both opinions are annexed hereto as an appendix to this opinion. Before the panel opinions were filed, a motion was made within the court to rehear the case in banc and the motion carried. Before reargument in banc was heard, Judge Craven died.

After reargument in banc, Chief Judge Haynsworth, Judge Winter, Judge Butzner, Judge Russell and Judge Widener vote to deny enforcement of the Board's order for the reasons set forth in Judge Winter's panel opinion, which they adopt, and the additional statement which follows. Judge Hall would grant enforcement of the Board's order for the reasons set forth in Judge Craven's panel opinion, which Judge Hall adopts as his dissenting opinion from the decision of the in banc court.

■■■ In addition to the issues discussed in Judge Winter's opinion, we must deal with another argument advanced by the Board to the in banc court. In its closing oral argument the Board asserted, for the first time, that, because of the employer's failure to comply with § 10(e) of the Act, 29 U.S.C. § 160, the court was foreclosed from considering the legality of the Board's order certifying MNA as the employees' collective bargaining representative on condition that MNA not do the collective bargaining. This argument was not advanced in the Board's initial brief, or in its supplemental

brief on rehearing in banc, or in its oral arguments to the original panel, or in its opening argument to the in banc court. The Board was not unaware of § 10(e) because it did invoke § 10(e) throughout the proceedings and the briefs with respect to other arguments made by MNA that we think it unnecessary to consider. The argument was, indeed, late, especially as counsel had received the advice set forth in the extract of letter appearing in the margin.[1]

Section 10(e) provides:

No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.

If we assume that the Board is not foreclosed by its own tardiness in invoking § 10(e), we nevertheless think that § 10(e) is not a bar to our consideration of the merits of the issue because (1) its purpose was fully served, (2) the hospital sufficiently raised the issue in the administrative proceedings, and (3) in any event, the Board's error was a purely legal one, so basic in its nature that § 10(e) has no application. We elaborate on these reasons. The beginning point is a summary of the issues raised before the Board in the various steps in the administrative proceedings.

The petition for representation was filed October 1, 1974, and hearings were held shortly thereafter. The employer filed a brief before the Regional Director on November 4, 1974, asserting that MNA was not a labor organization within the meaning of § 2(5) of the Act. While the brief discussed the problem of supervisory personnel, it did not otherwise elaborate on the issue. When the Regional Director ordered an election, the employer filed a petition for

1. In advising counsel that we had directed that the case be reargued in banc, we caused the clerk to write to counsel as follows:

The Court would particularly like to hear argument on the question of whether NLRB legally can certify Maryland Nurses Association as the representative of the employees when bargaining will be conducted solely by The Registered Nurses of Anne Arundel General Hospital, Professional Chapter of The Maryland Nurses Association, Inc., as well as any other issues that you think pertinent.

I would advise you also that counsel will have the right to file a supplemental brief on the issue that I have identified.

Both parties exercised their option to file a supplemental brief.

review, again expressing its opposition on the ground that MNA did not have the status of a labor organization within the meaning of § 2(5) because it was dominated and controlled by supervisory personnel.

The Regional Director concluded to reopen the record and scheduled another hearing. However, on the same day that the new hearing was scheduled to be held, the case was transferred to the Board.

Thereafter, the Board conducted an additional hearing on January 9, 1975, and the parties simultaneously filed briefs on February 6, 1975. MNA argued (1) that it was a labor organization within § 2(5) because none of the employer's supervisors were on the Board of MNA, and (2) *for the first time*, MNA asserted that it had delegated its collective bargaining activities to the professional chapters. MNA noted that the negotiating committee was chosen by the members of the chapter and contracts had to be ratified by the chapter. The employer persisted in its argument that MNA was controlled by supervisory employees and that the chapters were influenced and controlled by MNA. It did not respond to MNA's assertion that MNA had delegated its bargaining function to the chapters, because the briefs were filed simultaneously and the assertion on the part of MNA was new. Board regulations do not permit the filing of a reply brief except upon special leave of the Board, 29 C.F.R. § 102.67(i).

The Board's supplemental decision and direction of election (which in the main text we construe to mean that the Board certified MNA solely on condition that it not do the bargaining) was filed May 7, 1975. Admittedly, the employer did not file a petition for reconsideration pursuant to 29 C.F.R. § 102.65(e)(1).[2]

When the employer refused to bargain, an unfair labor practice complaint was filed. In answering it, the employer alleged that MNA was incompetent to serve as the exclusive bargaining representative of the employees, and it asserted that MNA had not been properly certified as the exclusive bargaining representative. It admitted that it had declined to bargain, but justified its refusal for the reasons stated. General Counsel moved for summary judgment, and in opposition to that motion the employer again argued that MNA was not a bona fide, exclusive representative of the employees and that MNA was influenced, dominated and controlled by supervisory employees. The Board, however, granted summary judgment, finding that the employer had committed an unfair labor practice in declining to bargain and it issued the customary bargaining order.

■ From this summary, it first appears that the concept of certifying MNA on condition that it not bargain was one that originated with the Board and was not one that was urged by the parties. The obvious purpose of § 10(e) is to permit the Board to act without being unfairly surprised by the consequences of its action. However, when the Board itself originates the concept of the action it takes, and does so at a time when the employer has something less than an unqualified right to advance to the Board the reasons why it thinks the Board's action is illegal, we think that there was sufficient compliance with § 10(e) so that § 10(e) does not constitute a bar to the employer's direct attack on the alleged invalidity in a reviewing court.

Next, it is clear that throughout the administrative proceedings the employer was constant in its assertion that MNA could

**2.** It is not clear from the text of the regulation that the employer had an unqualified right to litigate the issue by a petition for reconsideration. In pertinent part, § 102.65(e)(1) states:

A party to a proceeding may . . . move after the decision for reconsideration or rehearing, except that no motion for reconsideration or rehearing will be entertained . . . with respect to any matter which could have been raised but was not raised

before [the Board] pursuant to any other section of the rules in this part.

Since the employer could have sought special leave to file a reply brief to the MNA brief to the Board, it may be argued that the employer could, but did not, raise the issue earlier in the proceedings and therefore consideration of any motion for reconsideration on its merits was foreclosed.

not properly be certified because it was dominated by supervisory personnel and that as a consequence certification should be denied. The implied premise of such an argument was that, if certified, MNA was to be the bargaining agent, and that if MNA was not certified, no entity should be certified. The premise was tantamount to an assertion of the obvious, namely that a bargaining agent would bargain. By its order, the Board rejected the premise, but it cannot be said that the issue was not before it.

Finally, it is certain that the principal defect which we perceive in the Board's order is a purely legal one, namely that under the Act the Board may not certify a bargaining agent on condition that it not bargain. The Board has, in our view, exceeded its legal powers. We think, therefore, that § 10(e) is inapplicable because "the Board has patently traveled outside the orbit of its authority so that there is, legally speaking, no order to enforce." *NLRB v. Cheney California Lumber Co.,* 327 U.S. 385, 388, 66 S.Ct. 553, 554, 90 L.Ed. 739 (1946). *See also NLRB v. Ochoa Fertilizer Corp.,* 368 U.S. 318, 322, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961).

*ENFORCEMENT DENIED.*

APPENDIX

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 76–1166

National Labor Relations Board,

Petitioner,

versus

Annapolis Emergency Hospital Association, Inc., d/b/a Anne Arundel General Hospital,

Respondent.

Application for Enforcement of an Order of the National Labor Relations Board.

(Argued October 7, 1976        Decided        )

Before WINTER, CRAVEN and HALL, Circuit Judges.

Richard A. Cohen, Attorney, National Labor Relations Board (John S. Irving, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Carl L. Taylor, Associate General Counsel, Elliott Moore, Deputy Associate General Counsel, National Labor Relations Board, Aileen A. Armstrong, Attorney, National Labor Relations Board on brief) for Petitioner; N. Peter Lareau (A. Samuel Cook, Christopher H. Mills, Venable, Baetjer and Howard on brief) for Respondent.

CRAVEN, Circuit Judge:

The Employer, Anne Arundel General Hospital, refused to bargain with the newly certified representative of its rank-and-file registered nurses, the Maryland Nurses Association (MNA), on the asserted ground that MNA was not a bona fide labor organization due to the presence of supervisors in its hierarchy. The National Labor Relations Board found that the Employer violated 29 U.S.C. § 158(a)(5) by its refusal to bargain and entered an appropriate bargaining order. We grant the Board's petition for enforcement.

I.

Congress, in July of 1974, amended the National Labor Relations Act to bring within its protective ambit the employees of private nonprofit hospitals. Thereafter the MNA petitioned the Board on October 1, 1974, to authorize the election of a collective bargaining representative by registered nurses of the Employer. At initial pre-election hearings the Employer disputed the MNA's eligibility to be a bargaining representative on the basis that it was not a bona fide "labor organization" within the meaning of the National Labor Relations Act due to "supervisory domination." Rejecting the Employer's contention, the Board directed an election, and on the basis of its results the MNA was certified.

When the Employer refused to bargain, the Board summarily decided that it was without justification in so doing since (1) it had previously received a hearing on the merits of its allegation of supervisory domination, at which time it was found that the MNA had delegated plenary bargaining responsibility to the local bargaining unit, *i.*

*e.*, the Anne Arundel Chapter,[1] which is itself free of supervisory membership, and (2) it had come forward with no newly-discovered evidence to support its claim of supervisory domination. It is now the Employer's position that the Board's finding of nondomination is without substantial evidentiary support and further that its finding of a "delegation" by the MNA of plenary bargaining responsibility to the Anne Arundel Chapter is logically inconsistent with its certification of the MNA as exclusive representative of the local bargaining unit.

Section 3(f) of Article 1 of the MNA's bylaws states that one of its goals is "to represent nurses by collective bargaining regarding wages, hours and other conditions of employment." And in fact the MNA has previously negotiated a number of collective bargaining agreements. Internally the MNA is structured much like a three-tiered pyramid. At the apex are its Board of Directors and the Council on Professional Employment Activities (Council) which conducts the MNA's economic security program. One rung below are the seven District associations which represent specific geographical areas within the state. At the bottom of the structure are 20 local organizations known as Professional Chapters. The Anne Arundel Chapter is a member of District 3. The Employer points out that at least 10 members of the current 14-member Board of Directors are supervisors within the meaning of Section 2(11) of the Act. The Board of Directors appoints the MNA's executive and associate executive directors, and since 1970 the current associate executive director has been the regular representative of all Chapters at all collective bargaining sessions between the MNA and employers. The Council is comprised of the chief officers of each Chapter; and while it appears that in some cases "supervisors" are eligible to hold those offices, none presently do, nor can any of the Employer's supervisors ever do so, since the Anne Arundel Chapter excludes supervisors from membership.

The Board found that the MNA had delegated its collective bargaining responsibility respecting the Employer's employees to its Anne Arundel Chapter; that the Chapter, which coincides with the bargaining unit, has a negotiating committee elected by its general membership; that the members themselves select the bargaining items and collaborate with their negotiating committee; and further that an agreement, if reached, would be ratified by the local membership.

## II.

### A.

If this Employer's concern with supervisory domination is genuine, it comes some 30 years too late. Prior to the Taft-Hartley Act of 1947 the involvement of supervisors with unions was a source of legitimate concern on the part of employers. That was so because of decisions which held that supervisory personnel were entitled to full rights under the Wagner Act of 1935. *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). The effect of *Packard* was to erode industrial discipline by "obliterat[ing] the line between management and labor." 330 U.S. at 494, 67 S.Ct. at 794 (Douglas, J., dissenting); S.Rep.No.105, 80th Cong., 1st Sess. 3 (1947); 1 Legislative History of the Labor Management Relations Act 409–410 (1947). The Taft-Hartley Act changed this by denying to supervisors the status of "employees" within the Act. 29 U.S.C. § 152(3). Today if a supervisor devotes his time or loyalty to a union, he is unprotected by 29 U.S.C. § 157, and does so at the mercy of his employer, who may lawfully fire him for unapproved union activity. *Beasley v. Food-Fair of North Carolina*, 416 U.S. 653, 94 S.Ct. 2023, 40 L.Ed.2d 443 (1974); *Florida Power & Light Co. v. IBEW*, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974). Thus Taft-Hartley, as interpreted in *Beasley,* has all but eliminated genuine employer

1. The Chapter's official designation is "The Registered Nurses of Anne Arundel General Hospital, Professional Chapter of The Maryland Nurses Association, Inc."

concern with union activity by its supervisors. For this reason alone, any asserted fear of erosion of management prerogatives is untenable.

### B.

The other side of the coin is the fear of erosion of union prerogatives by a fifth column of supervisors loyal to management. Unions fear employer domination. Employers, contrary to the contention here, do not. That is why domination of a labor organization by an employer is made an unfair labor practice. 29 U.S.C. § 158(a)(2). And because of the unprotected status of supervisors under the Act, the Board—like the employer—is free to determine the extent of active union participation to be permitted a supervisor, in order to protect union integrity and to cleanse the collective bargaining process of any possible taint of employer influence.[2] *Local 636, Plumbing & Pipe Fitting Industry v. NLRB,* 109 U.S. App.D.C. 315, 323, 287 F.2d 354, 362 (1961). Thus the Board has denied supervisor-members of a union the right to vote in a union's election of officers, even absent evidence of higher company involvement or of the impact of the votes—holding that such voting constituted unlawful employer domination and interference in violation of 29 U.S.C. § 158(a)(2). *Bottfield Refractories Co.,* 45 LRRM 1522 (1966). *Cf., Brunswick Pulp and Paper Co.,* 152 NLRB 973 (1965).

Here the Employer attempts to turn the statutory offense of "employer domination" into an excuse for refusing to bargain. Apparently it would exploit the Board's liberality in finding "supervisory domination" where, as above, the remedy is merely to forbid supervisors to do what the Taft-Hartley Act has already denied them the "right" to do. As turned around by the

Employer, however, the only possible remedy becomes decertification of the union; it would be a sufficient answer to say that employees have the "right" to bargain collectively "through representatives of their own choosing." 29 U.S.C. § 157. More importantly, the Employer does not—nor could it—seriously complain of the presence of its own supervisors in the union membership,[3] a presence which it controls. Rather we are asked to hold that the presence of supervisors of *other* employers in the union membership and hierarchy somehow flaws the integrity of the bargaining representative. If that is the case, the reason can only lie in some conflict of interest—the problem we now address.

### III.

The Employer's attempt to disqualify the MNA from serving as a bargaining representative—essentially on the basis of a conflict of interest—runs counter to the literal provisions of the National Labor Relations Act, as amended. The Act gives the majority of the employees of a bargaining unit the unqualified right to choose any labor organization as its exclusive representative, 29 U.S.C. §§ 159(a), 152(4); and "labor organization" is defined to be:

> Any organization of *any kind* . . . in which employees participate and which exists for the purpose, *in whole or in part,* of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

29 U.S.C. § 152(5) (emphasis added). Accordingly, where, as here, the Board has been properly petitioned by a labor organization and a hearing has disclosed that a substantial number of employees do in fact desire that labor organization to be their

---

2. Supervisors have a right under 29 U.S.C. § 164(a) to belong to a labor union—even one made up largely of rank-and-file workers, *Nassau & Suffolk Contractors' Ass'n.,* 40 LRRM 1146 (1957), but their activity may be restricted by the Board to prevent employer domination of the Union. *Local 636, Plumbing & Pipe Fitting Industry v. NLRB,* 109 U.S.App.D.C. 315, 323, 287 F.2d 354, 362 (1961).

3. The Employer's sole contention regarding its current supervisors is that "MNA's District 3, which controls discipline of Anne Arundel Chapter nurses, is influenced, dominated and controlled by supervisors *who are employed by Respondent* "; however, it does not contest the Board's finding that District 3 officials cannot exert control over collective bargaining.

bargaining representative, and the employer declines recognition, the Act provides that the Board "*shall* direct an election by secret ballot and *shall* certify the results thereof." 29 U.S.C. § 159(c)(1) (emphasis added).

Despite the congressional policy favoring free choice by employees of their bargaining agent, the Board has been permitted to override the literal language of Section 9(c)(1) of the Act when, *in its judgment,* certification would jeopardize other significant policies of the Act.

> [The Board] has discretion to place appropriate limitations on the choice of bargaining representatives should it find that public or statutory policies so dictate. *Its determinations in these respects are binding upon reviewing courts if grounded in reasonableness.*

*NLRB v. Jones & Laughlin Steel Corp.,* 331 U.S. 416, 422, 67 S.Ct. 1274, 1278, 91 L.Ed. 1575 (1947) (emphasis added).

Currently it is the policy of the Board not to overturn the democratic processes of the Act save in clear cases of conflict of interest, which render the labor organization incapable of single-minded pursuit of the welfare of the bargaining unit. *See International Paper Co.,* 172 NLRB 133 (1968) *and Oak Ridge Hospital of United Methodist Church,* 90 LRRM 1217 (1975). In keeping with *Jones & Laughlin,* the First Circuit has stated that the Board properly puts the burden of demonstrating a "clear and present" danger of conflict upon any employer who refuses to bargain.

> There is a strong public policy favoring the free choice of a bargaining agent by employees. This choice is not lightly to be frustrated. There is a considerable burden on a non-consenting employer, in such a situation as this, to come forward with a showing that danger of a conflict of interest interfering with the collective bargaining process is *clear and present.*

*NLRB v. David Buttrick Co.,* 399 F.2d 505, 507 (1st Cir. 1968).

The Second Circuit has said the same, adopting the clear and present danger test:

> There have been exceptions to the general rule that either side can choose its bargaining representatives freely, but they have been rare and confined to situations so infected with ill-will, usually personal, or conflict of interest as to make good-faith bargaining impractical.

*General Electric Co. v. NLRB,* 412 F.2d 512, 517 (2 Cir. 1969). *Accord, NLRB v. Mt. Clemens Metal Products Co.,* 287 F.2d 790, 791 (6th Cir. 1961).

Even though none of *its* supervisors are officers or directors of the MNA, the Employer asserts a potential conflict of interest in the fact that supervisors generally, by whomsoever employed, share a proprietary perspective which favors the moderation of wages and fringe benefits. The premise is unsupported. The Congress itself must have thought otherwise, for management's fear of union-oriented supervisors is what originally took them out from under the protection of the Act. Alternatively, the Employer says it fears that MNA officials who are supervisors would be tempted to use their positions to advance the competitive position of their own hospitals as against the Employer.

In evaluating the potentiality of a conflict of interest, it is proper to focus on the presence of two elements—power to control bargaining and a selfish motive to exercise it. Neither alone is sufficient to disqualify a bargaining representative. For instance, the *David Buttrick Co.* case, *supra,* involved a loan by the international union of a certified local to a competitor of the employer. First, the Board determined that the possibility of the international's intervention in local bargaining was too remote to disqualify the local union. Then on appeal the First Circuit, *ex industria,* found that, even assuming the presence of control over bargaining by the international, there was no evidence that the debtor-competitor's financial situation was such as to give the international a sufficient equity-like interest in the success of the employer's rival to create a reason or motive for intervention.[4] 399

---

4. Of course motive would have been present had the international in fact owned the rival company. *Bausch & Lomb Optical Co.,* 34 LRRM 1222 (1954).

F.2d at 507. *Accord, Harlem River Consumers Coop*, 77 LRRM 1883 (1971).

Beyond purely speculative allegations, the Employer here provided the Board no grounds to support a finding of motive to interfere. There was no evidence tending to show that any of the supervisor-officers of the MNA worked for institutions that compete with the Employer. Thus, assuming the power of supervisors in the hierarchy of the Union to subordinate the interests of rank-and-file employees in favor of helping their hospitals by harming the Employer, the second essential element was lacking. Nor is there anything in the record to suggest that the supervisors who were officers of MNA would have the slightest interest in taking the side of this "stranger" employer versus the interests of the rank-and-file nurses.

The Board, however, never reached the question of motive because it determined that supervisors could not control the bargaining process, given its finding that the MNA "has delegated its collective bargaining authority respecting the Employer's employees to its Anne Arundel Hospital Professional Chapter independent of ANA or other MNA influences . . . ." It also found that the local unit admits no supervisors to membership and hence that the MNA "in its collective bargaining process is not subject to the influence, domination, or control of supervisors . . . ." *Cf. Pacific Far East Lines, Inc.*, 74 NLRB 1168 (1969) *and Carle Clinic Assoc.*, 192 NLRB 512 (1971). The decision of the Board not to override the democratic right of employees to choose their representative

falls within its special competence. *Jones & Laughlin Steel Corp., supra*, 331 U.S. at 422, 67 S.Ct. 1274; *Marriott Corp. v. NLRB*, 491 F.2d 367 (9th Cir.), *cert. denied*, 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974).

### IV.

Finally, the Employer challenges the legitimacy of any such delegation of plenary collective bargaining responsibility by the certified representative.[5] It is the Employer's position that by virtue of the delegation the MNA lost its status as a "labor organization." The Employer seems to have overlooked basic principles of agency which provide that an agent (the local chapter) may be authorized to use its discretion, and that, if so authorized, an agent's exercise of discretion binds its principal (MNA).[6] 2A C.J.S. Agency § 247 (1972). As a result, the MNA will be bound by and must use its good offices to enforce any collective agreement reached by the Anne Arundel Chapter.[7]

Alternatively, the Employer may be understood to invoke the general maxim that a delegate (MNA) trusted with discretionary authority cannot lawfully devolve the duty upon another unless expressly authorized to do so: *delegatus non potest delegare*. This principle binds public and private representatives alike. 3 C.J.S. Agency § 257 (1973). *Shankland v. Mayor of Washington*, 30 U.S. (5 Pet.) 390, 395, 8 L.Ed. 166 (1831); *Shreveport Engraving Co. v. United States*, 143 F.2d 222, 226 (5th Cir.), *cert. denied*, 323 U.S. 749, 65 S.Ct. 82, 89 L.Ed.

---

**5.** "Delegation" is apparently widespread among state affiliates of the American Nurses Association which seek "representative" status under the National Labor Relations Act. *See, e. g., International Paper Co.*, 172 NLRB 133 (1968); *Sierra Vista Hospital Inc.*, 225 NLRB No. 115 (1976); *and Sisters of Charity of Providence, Saint Ignatius Province*, 225 NLRB No. 110 (1976).

We think the Board's order should be enforced even if there had been no delegation to the local unit. *See id.* at n. 14 (Jenkins, Member, special concurrence) *and Oak Ridge Hospital of the United Methodist Church*, 220 NLRB No. 9, 90 LRRM 1217, 1218 (1975).

**6.** A "labor organization" need exist only "in part" for the purpose of "dealing with employers," 29 U.S.C. § 152(5), hence no reason appears why such a partial function should not be performed by some lesser unit of the entire organization.

**7.** The Employer, by contrast, has argued that the MNA Board of Directors through the power of the purse could arbitrarily decree which grievances the Anne Arundel Chapter might process.

600, *rehearing denied*, 323 U.S. 815, 65 S.Ct. 128, 89 L.Ed. 648 (1944). Here, however, the delegate (MNA) has not further delegated its representational responsibility to a potentially irresponsible third party; it has merely returned a measure of discretion to its principal, *viz.*, the bargaining unit from whence it derived authority in the first place.

The MNA possesses important qualifications of a bargaining representative. Not least, of course, it has succeeded in winning an election. Beyond that the larger MNA apparatus is prepared to use its past experience in order to serve in a supportive capacity to its local Anne Arundel Chapter, offering it the technical advice and bargaining know-how, including sample terms from other collective bargaining agreements, necessary for achieving bargaining goals. But such practical considerations are largely foreign to the question of certification. For, again, we must not lose sight of the largely passive role which the statute assigns the Board in representational matters. Absent a true conflict of interest, the Board has no authority, even in the service of logical symmetry, to deny a place on the ballot to a petitioner in favor of its local chapter. For the Board cannot substitute on its own initiative a "better" or more "logical" petitioner, nor yet can it assume that any such "preferred" petitioner would either desire to wage a union campaign on its own or find favor with the workers if it did. Because of these uncertainties the Act discourages meddling by the Board with democratic processes, providing as it does that the Board "shall" hold the election and "shall" certify the winner. 29 U.S.C. § 159(c)(1).

Having never bargained collectively, the Employer here is basically contesting the initial certification of MNA and does so on speculative grounds. However, once certification has issued and the bargaining process is begun, the Act provides adequate machinery for asserting an actual conflict of interest.[8] *See Margaret-Peerless Coal Co.*, 173 NLRB 16 (1968). Indeed, it is certification itself which creates the union's duty to avoid any conflict with its bargaining duties. Meanwhile, as this case indicates, there is a particularly grave risk that the asserted conflict of interest may simply involve "some employer seeking to delay or avoid the day he must deal with his employees collectively rather than individually." *Bekins Moving and Storage Co.*, 86 LRRM 1323, 1333 (1974) (Fanning and Penello, Members, dissenting).

To override the literal policy of the Act favoring the untrammeled choice by employees of their own bargaining representative, the Board is justified in requiring an "unmistakable" showing that the duly elected representative is "not capable of dealing on [their] behalf . . . at arm's length with their employer," *Rochester and Pittsburg Coal Co.*, 56 NLRB 1760, 1763–64 (1944). For want of such a showing the Board's order will be

*ENFORCED.*

WINTER, Circuit Judge, dissenting:

I would refuse enforcement of the Board's order directing the employer to bargain because the Board's certification of MNA as the employees' collective bargaining representative was (a) improper as a matter of law, and (b) improper as a matter of fact since the Board's findings that MNA would have no voice or control in actual collective bargaining lack substantial evidentiary support. The astonishing result which flows from the majority's decision is that the Board may certify a collective bargaining representative *on the condition that*

---

8. The Board's bargaining order was based in part upon the fact that the Employer has merely renewed his pre-certification contentions without adducing new evidence of actual bad faith or conflict of interest. *See Pittsburg Plate Glass Co. v. NLRB*, 313 U.S. 146, 162, 61 S.Ct. 908, 85 L.Ed. 1251 (1941). In the event the Employer should discover such evidence, the Board, having stated elsewhere its sensitivity to the possibility of such future conduct, would presumably be willing to entertain a motion to revoke certification. *NLRB v. David Buttrick Co.*, 399 F.2d 505, 507 (1st Cir. 1968), 69 LRRM 2044, 2044; *Sierra Vista Hospital, Inc., supra* note 5; *Sisters of Charity of Providence, Saint Ignatius Province, supra* note 5.

*it not bargain for the employees it represents.* I think this incorrect as a matter of law. In my view, the majority is also in error in concluding that there is substantial evidence to support the Board's finding that MNA has divested itself of control over the bargaining process which the Board requires as a condition of MNA's certification.

From these holdings, I respectfully dissent.

### I.

The majority opinion adequately describes the three-tiered structure of MNA[1] —its statewide organization, its geographical districts within the state, and its professional chapters within each district. Annapolis Emergency Hospital Association, Inc., d/b/a Anne Arundel General Hospital (the employer), is located in District 3 and its employees are members of the chapter known as "The Registered Nurses of Anne Arundel General Hospital, Professional Chapter of the Maryland Nurses Association, Inc." (hereafter AAC). Approximately one-third of MNA's members are supervisors, and supervisors serve as officers, directors and professional council members of MNA. No supervisor hired by the employer, however, presently serves as a director or officer of MNA; and no supervisor hired by the employer may serve as a member of the Council on Professional Employment Activities because the Council is composed of the chief officers of the several chapters and AAC apparently does not admit supervisors to membership.[2] Some of the employer's supervisors do serve, however, as District 3 officers.

There can be no doubt that the Board certified MNA on condition that AAC, and not MNA, would conduct bargaining. The Board's order stated, "[n]either the ANA nor MNA or its councils, districts, or any of its other components, is authorized to assert control over the professional chapter [AAC] in collective bargaining, or over the results of such bargaining," and then concluded:

[I]nasmuch as the Petitioner, through its Anne Arundel Professional Chapter, has delegated its collective-bargaining authority respecting the Employer's employees to its Anne Arundel Hospital Professional Chapter, independent of ANA[3] or other MNA influences, and as that chapter admits no supervisors to its membership, and has no employer supervisors as its officers or directors, we find, contrary to the Employer, that the Petitioner, in its collective-bargaining process is not subject to the influence, domination, or control of supervisors as defined in the Act. Accordingly, and inasmuch as the Petitioner otherwise satisfies the requirements set forth in Section 2(5) of the Act, we find that it is a bona fide labor organization within the meaning of the Act. (Citation omitted.)

Any doubt that, to the Board, delegation of the bargaining function to AAC was the *sine qua non* to certification of MNA is dispelled by reference to contemporaneously decided cases, both involving the certification of other state affiliates of ANA as bargaining agents for nurses. *See Sisters of Charity of Providence, St. Ignatius Province, d/b/a St. Patrick Hospital*, 225 N.L. R.B. No. 110 (1976), and *Sierra Vista Hospital, Inc.*, 225 N.L.R.B. No. 155 (1976). In both, the Board's decision in the instant case was cited in support of the conclusion that since the state-wide nurses' association had delegated its bargaining function to a

---

1. MNA is one of eighteen state affiliates of The American Nurses Association, Inc., a nationwide association of nurses.

2. The evidence on this point, while probably sufficient to support a finding that AAC does not admit supervisory personnel to membership, is far from conclusive even though the fact should have been readily capable of exact proof. AAC's bylaws, containing no limitation on membership, were in evidence. On January 9, 1975, a representative of MNA testified that the bylaws had been amended prior to October 1, 1974, to limit membership to non-supervisory nurses. No document reflecting the change was produced. On October 21, 1974, the same representative testified that "everyone up to the nursing director" was eligible to join AAC.

3. American Nurses Association, Inc., the national organization.

local autonomous chapter of non-supervisory nurses, the state-wide association had cured any ineligibility to be certified. Moreover, in both cases, the Board, by telegraphic orders, had previously stated that if the state-wide association failed to delegate its bargaining function to a local chapter controlled by non-supervisory employees, "a motion to revoke the certification will be entertained." Notwithstanding this obvious prerequisite, in the instant case, the Board's actual order certified MNA and not AAC, and the Board's bargaining order, based upon the employer's conceded refusal to bargain, directed the employer to bargain with MNA and not AAC.

The Board was not explicit in articulating its reasons why MNA would not have been certified without having delegated the bargaining function to AAC. Its decision, however, seems designed to answer two arguments: first, that MNA was not a labor organization within the meaning of § 2(5) because of its supervisory members and its divers interests; and, second, that there are inherent dangers in certifying any ·labor organization containing a large number of an employer's supervisors because of dangers to the bargaining process and unfairness to the employees. In regard to the first argument, it is true that MNA exists "in part" for the purpose of dealing with employers concerning conditions of work. While delegation of the bargaining function might solve the problem of MNA's having supervisory members, it would not solve the problem of MNA's other interests. Therefore, it must be concerns relating to the second argument that required delegation. This conclusion is reinforced by the references to employer domination throughout the Board's decision in this case, as well as in *Sisters of Charity of Providence* and *Sierra Vista Hospital.*

4. *Packard Motor* held that the Wagner Act was applicable to supervisory employees. As a consequence, the Court held that the Board could permit supervisory employees to be union members, to bargain, and to invoke the protections afforded by the Act.

5. The Board, as the majority discusses, may have also been attempting to avoid a conflict of interest problem which would have led to an

Board decisions reflect that it is fundamental Board policy that a labor organization controlled by supervisors is not qualified to serve as a collective bargaining representative. *See Brunswick Pulp & Paper Co.*, 152 N.L.R.B. 973 (1965); *New York City Omnibus Corp.*, 104 N.L.R.B. 579 (1953); *Alaska Salmon Industry, Inc.*, 78 N.L.R.B. 185 (1948). While Congress, in enacting the Taft-Hartley Act, partially overruled *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947),[4] the Board's policy not to permit supervisor-dominated unions from representing employees is in full accord with congressional policy and intent. *See* I Legislative History of the Labor Management Relations Act of 1947, 409–11 (1948). It is also a necessary consequence of § 8(a)(2) of the Act (incorporating § 8(2) of the Wagner Act verbatim) making it an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization" since supervisory employees are treated as representatives of the employer. *See* Note, The Role of Supervisors in Employee Unions, 40 Chi. L.Rev. 185, 200–04 (1972). In sum, in accord with cases like *Local 636, United Association of Journeymen v. NLRB*, 109 U.S. App.D.C. 315, 287 F.2d 354 (1961), the Board correctly concluded that MNA was a labor organization subject to interference from supervisors, and thus not an appropriate bargaining agent. *Cf. David Buttrick Co.*, 66 L.R.R.M. 1057, 1058 n. 10 (1967) (distinction drawn between designation of international and local in conflict-of-interest case), *enforced*, 399 F.2d 505 (1 Cir. 1968).[5]

The Board's decision to require delegation was clearly designed to alleviate this prob-

infection of the bargaining process. *See, e. g., Medical Foundation of Bellaire*, 193 N.L.R.B. 62, 64 (1971); *Welfare and Pension Funds*, 178 N.L.R.B. 14 (1969); *Teamsters Local 249*, 139 N.L.R.B. 605, 607 (1962); *Bausch & Lomb Optical Co.*, 108 N.L.R.B. 1555, 1559 (1954). *See also Schmerler Ford, Inc. v. NLRB*, 424 F.2d 1335, 1339 n. 2 (7 Cir. 1970), *cert. denied*, 400 U.S. 823, 91 S.Ct. 45, 27 L.Ed.2d 52 (1970).

lem. *See State v. Professional Ass'n of N.J. Dept. of Ed.*, 64 N.J. 231, 315 A.2d 1, 4 (1974); *Bowman v. Hackensack Hospital Assoc.*, 116 N.J.Super. 260, 282 A.2d 48 (1971) (designation of employees' Economic Security Organization connected to New Jersey State Nurses' Association instead of the Association to alleviate similar problem). First, the Board noted MNA has delegated its collective bargaining obligations to AAC. Second, the Board noted that AAC contains no supervisors as members or officers. In essence, the Board was not only requiring the bargaining unit to contain no supervisors, but was requiring the "union" or labor organization to contain no supervisors. The inescapable inference was that there can be no domination or interference problem with regard to AAC because it, unlike MNA, contains no supervisors.

Although not articulated as such, another reason which probably motivated the Board is that certification of MNA without requiring delegation of its bargaining authority would have raised the difficult problem of whether an employer can be forced to bargain with a labor organization which allows the employer's supervisors to be members.[6] I am inclined to think that the Board purposefully sought to avoid this issue by requiring the employer to bargain with AAC.

■ Board cases do hold that labor organizations which have an employer's supervisors as members may be certified as bargaining agents, *see, e. g., Oak Ridge Hospital of the United Methodist Church*, 192 N.L.R.B. 512 (1971); *Carle Clinic Assoc.*, 192 N.L.R.B. 512 (1971); *Pacific Far East Lines, Inc.*, 174 N.L.R.B. 1168 (1969); *International Paper Co.*, 172 N.L.R.B. 933 (1968), but this is not equivalent to requiring the employer to bargain. No courts have addressed the issue so far as I am aware. I do not undertake its resolution, but I submit that it is not an issue without difficulties, *see Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 659, 94 S.Ct. 2023, 2027, 40 L.Ed.2d 443 (1974) ("Employers were not to be obliged to recognize and bargain with unions including or composed of supervisors.")[7]

■ The issue becomes whether the Board may within its discretion certify MNA on condition it does not bargain to alleviate these difficulties and still have it constitute a labor organization within the National Labor Relations Act. The reality of the Board's order in the instant case is a holding that MNA will be certified as the bargaining agent; but because it is, in the Board's view, incompetent to act as the bargaining agent, the certification is conditioned upon MNA's having no voice or con-

---

**6.** The majority opinion blithely asserts that MNA should have been certified even if there had been no delegation to AAC (majority opinion n. 5), thereby failing to recognize the problem. I do not think the matter quite so easy of decision.

**7.** It should be noted that a labor organization is an organization "in which employees participate," *see* 29 U.S.C. § 152(5), not an organization in which supervisors participate. An "employee" within the meaning of the Act excludes supervisors. As the majority recognizes, an employer may fire a supervisor for participating in a union. *See Florida Power & Light Co. v. IBEW*, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974). This remedy does, however, place the burden upon the employer to enforce his rights by exercising his right of discharge. The unanswered question is whether the employer may utilize the alternative, less drastic remedy of refusal to bargain with a union containing his supervisors. *Cf. Typographical Local 38 v. NLRB*, 278 F.2d 6 (1 Cir.

1960) (violation of § 8(b)(2) and § 8(b)(3) for union to insist that supervisor be a member of the union), *aff'd by an equally divided court*, 365 U.S. 705, 81 S.Ct. 855, 6 L.Ed.2d 36 (1961). Therefore, cases holding a union that contains supervisors may be a labor organization for purposes of § 8(b), *see, e. g., Masters, Mates & Pilots Union v. NLRB*, 159 U.S.App.D.C. 11, 486 F.2d 1271 (1973), *cert. denied*, 416 U.S. 956, 94 S.Ct. 1970, 40 L.Ed.2d 306 (1974); *Marriott Corp. v. NLRB*, 491 F.2d 367 (9 Cir.), *cert. denied*, 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 578 (1974), or for purposes of LMRA § 301, *see Pharmacists Employees Local 330 v. Lake Hills Drug Co.*, 255 F.Supp. 910 (D.Wash.1964), are not determinative. *Cf.* Report and Recommendations on Labor-Management Relations in the Federal Service, GERR Ref. File 21:1018 (1973) (supervisors should not participate in the management of labor organization within Executive Order 11491); Executive Order 11491 §§ 2(c), 10(b)(1), 21(b), 24(2).

trol in the bargaining process; rather, bargaining must be carried on exclusively by a different labor organization as defined by 29 U.S.C. § 152(5). I think that such an order is illogical and illegal.

Under the statutory scheme set forth in 29 U.S.C. § 159, the Board is authorized to certify "representatives" for collective bargaining designated or selected by a majority of the employees in an appropriate unit. The term "representatives" is defined by 29 U.S.C. § 152(4) to mean "any individual or labor organization." In order for MNA to be a "representative," it must satisfy the definition of "labor organization" contained in 29 U.S.C. § 152(5). That subsection provides:

> The term "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

██ It is obvious that a principal function—indeed, the most important function—of a "labor organization" is to carry on collective bargaining, and logically it would seem that the employees' certified representative would perform that function. Yet the Board's order certifying MNA effectively prohibits MNA from that activity.[8] The logical inconsistency of the result is manifest. In my view, the result also violates the Act. For purposes of the present case, i. e., an unfair labor practice proceeding for refusal to bargain in violation of § 8(a)(5), I read §§ 159, 152(4) and 152(5) to require that the certified labor organization be willing and able to bargain and to prohibit the Board from certifying MNA to bargain on condition that it not bargain. It is true that the Board has discretion to place appropriate limitations on the choice of bargaining representatives to carry out statutory policies, see NLRB v. Jones & Laughlin Steel Corp., 331 U.S. 416, 422, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947), but the existence of that discretion implies a duty to comply with the congressional directive. See Jones & Laughlin, 331 U.S. at 422–23, 67 S.Ct. 1274.

██ Moreover, under 29 U.S.C. § 159(c)(1) and 29 C.F.R. §§ 101.17, 102.60 (1976), a petition for certification must be filed by employees, an individual or a labor organization in order for the labor organization or individual to be certified. The Board, by utilizing the procedure it has, has circumvented the question of whether the labor organization on the ballot is an appropriate representative and, by effectively certifying a different labor organization than that petitioning, it has not exercised its judgment or its procedures properly. See NLRB v. Jones & Laughlin Steel Corp., 331 U.S. 422–23, 67 S.Ct. 1278 (1947) ("A proper determination as to any of these matters, of course, necessarily implies that the Board has given due consideration to all the relevant factors and that it has correlated the policies of the Act with whatever public or private interests may allegedly or actually be in conflict.")

---

**8.** On that ground, the instant case is to be distinguished sharply from those cases in which a certified labor organization chooses an official of a local or other group to conduct its labor negotiations. See, e. g., General Electric Co. v. NLRB, 412 F.2d 512, 517 (2 Cir. 1969), and cases cited therein. The rationale of those cases is that the employees or the union may choose to have someone else bargain for them. The cases thus rest on notions of free choice and recallable delegation of authority. In the instant case, a non-revocable delegation of authority was the sine qua non to certification. Therefore, the principal can no longer veto the decisions of its negotiator as in General Electric. Moreover, while the delegation purportedly occurred before the election in the instant case, unlike the other cases where delegation was not required prior to election, the record fails to show that the employees eligible to vote in the election were ever advised about the delegation, let alone consented to it. See M. A. Norden Co., Inc., 159 N.L.R.B. 1730, 1732 (1966); Standard Oil Co., 92 N.L.R.B. 227 (1950), vacated on other grounds, 196 F.2d 892 (6 Cir. 1952). Therefore, the majority by permitting the certification is not acceding to employee free choice as it claims, but is directly frustrating free choice.

In conclusion, I think that by certifying MNA and directing it not to do what it should do, the Board has failed in carrying out its duties.

## II.

█ If it is assumed, nonetheless, that, consistent with the Act, the Board may certify a bargaining agent on condition that it not bargain, I am persuaded that there is not substantial evidence to support the Board's findings that MNA *has* delegated its bargaining function to AAC, and that AAC *is* "independent of ANA or other MNA influence . . . ." The evidence, as I appraise it, shows continuing and ultimate control by MNA over AAC. It follows, in my view, that the defects in the collective bargaining process which the Board avowedly seeks to avoid have not been obviated. In accord with Board policy, MNA should not have been certified.

Of course, MNA's bylaws purport to delegate, *inter alia*, to AAC the authority to effectuate MNA's policies at the employment level and to make rules and establish procedures for the conduct of AAC's business. The associate executive director of MNA testified that the purpose of the bylaws was to delegate the *entire* authority for collective bargaining to the professional chapters.[9] The duties of the Council on Professional Employment Activities include the development and implementation of MNA's policy on professional chapters (including AAC) and employment-level matters, and the promotion and establishment of employment conditions for appropriate groups within each of the clinical divisions. There was evidence that neither MNA nor the Council is authorized to assert any control over AAC in collective bargaining or over the results of such bargaining other than the perfunctory duty of ratifying and executing any contract which AAC negotiates; AAC has its own negotiating committee, selected by its members; and, in order for it to be binding, the members of AAC must ratify any collective bargaining agreement negotiated with the employer.

If the evidence set forth in the preceding paragraph was all the evidence, the Board's factual determination would have substantial support. But other evidence shows that MNA has means to control AAC and, in fact, exercises substantial control over bargaining activities. MNA's principal instrument of control is the power of the purse. AAC collects no dues and has no authority to assess its members. All dues are paid to ANA which remits a portion to MNA and the districts. AAC must make budget requests to the Council and if it approves, AAC's budget is subject to further approval by MNA's board of directors. If AAC incurs unforeseen expenses, it may obtain reimbursement only if the Council requests and the board of directors approves additional funds. Certainly MNA dominates AAC's bargaining and grievance procedures through fiscal control. *Cf. Quad City Builders Association v. Tri City Bricklayers Local 7*, 431 F.2d 999 (8 Cir. 1970) (for the purpose of 29 U.S.C. § 186, jointly administered labor-management industrial funds must be free of union control); *Mechanical Contractors Association of Philadelphia v. Local Union 420*, 265 F.2d 607 (3 Cir. 1959) (same); *Pacific Electricord Co.*, 153 N.L.R.B. 521 (1965), *enf'd*, 361 F.2d 310 (9 Cir. 1966) (employee domination through financial assistance).

MNA participates directly in the bargaining process. It furnishes the local chapters, such as AAC, advice and guidance on collective bargaining; it holds seminars and gives lectures on bargaining goals and strategies; it supplies economic data on nurses' salary scales for use in bargaining negotiations. The associate executive director of MNA admitted that his primary function was to

---

**9.** This was the same witness whose testimony is discussed in n. 2. With respect to delegation, this witness testified earlier that MNA did deal with employers concerning wages, hours and conditions of employment. Indeed, he claimed to handle personally all of MNA's collective bargaining negotiations. He then described the local chapters, including AAC, as only quasi or semi-autonomous. He never undertook to explain the conflicts in his testimony.

participate in every bargaining session between an employer and health care employees from 1970 to January, 1975. He also advised and formulated goals and objectives for collective bargaining negotiations for chapters, as well as participated in the bargaining sessions to achieve them. MNA's board of directors has established no-strike and no-union-security agreement rules which are binding on the chapters. The associate executive director can be expected to carry out these policies together with whatever other attitudes, policies, goals and restrictions MNA may adopt in the future.

Moreover, District 3 retains all power to discipline nurses, including the authority to suspend or expel nurses from membership for such things as violating the no-strike provision. Such power can easily be utilized to influence bargaining decisions and bring about results thought to be appropriate by MNA.

Under the evidence I have recited—and I can find in the record no substantial contradiction of it—I think that the independence of AAC and the lack of domination by MNA in the bargaining process is more illusory than real. On this ground also, I would vacate the Board's finding that MNA has delegated its bargaining function and decline to enforce its order.

### III.

I am constrained to add a specific comment about the majority opinion. I do not view the case as one in which the issue of delegation is saved until the last and then brushed aside on principles of the law of agency. Delegation is the principal issue, because without delegation MNA would not have been certified. I believe that I have shown that it was illegal, as a matter of law, and that the actual finding that it had occurred lacks substantial evidentiary support. I would vacate the Board's findings and refuse enforcement of its order.